James WEIR, Relator,

v.

ACCRA CARE, INC., Respondent,

Department of Employment and
Economic Development,
Respondent.

No. A12–0764.

Court of Appeals of Minnesota.

Feb. 25, 2013.

James Weir, Richfield, MN, pro se relator.

ACCRA Care, Inc., Hopkins, MN, respondent. Lee B. Nelson, Amy R. Lawler, Minnesota Department of Employment and Economic Development, St. Paul, MN, for respondent Department of Employment and Economic Development.

Considered and decided by ROSS, Presiding Judge; HALBROOKS, Judge; and KIRK, Judge.

## OPINION

HALBROOKS, Judge.

Pro se relator James Weir challenges respondent Minnesota Department of Em-

ployment and Economic Development's (DEED) determination that he is not eligible for unemployment benefits because his employment with respondent ACCRA Care, Inc. was "noncovered employment." Because we conclude that the statute classifying Weir's employment as noncovered employment violates the state constitution, we reverse.

## FACTS

The facts are undisputed. Weir began caring for his mother as a personal-care assistant (PCA) employed through AC-CRA in March 2010. Minnesota offers PCA services to qualifying individuals as part of its medical-assistance program. Minn.Stat. § 256B.0659 (2012). The program allows some family members to become PCAs, but not "parents, stepparents, and ... spouses." *Id.*, subd. 11(c). PCAs must meet several requirements, including being employed by a personal-care-assistance-provider agency. *Id.*, subd. 11(a)(2). PCAs so employed are "limited to providing and being paid for up to 275 hours per month." *Id.*, subd. 11(a)(10). But the law authorizes the "flexible use" of authorized hours within "a service authorization period covering no more than six months, in order to more effectively meet the needs and schedule of the recipient." *Id.*, subd. 15. There is no question that Weir met all of the statutory requirements to be a PCA for his mother.

Weir continued to care for his mother until she passed away on December 18, 2011. Weir then applied for unemployment benefits based on his employment with ACCRA, but DEED deemed him ineligible because his employment was considered "noncovered" employment. Employees without sufficient wages in "covered" employment during a given base period are not eligible for unemployment benefits.

Minn.Stat. § 268.07 (2012). Weir was informed that, effective July 1, 2010, the state's unemployment-insurance statutes were amended to include "employment of an individual who provides direct care to an immediate family member funded through the personal care assistance program under section 256B.0659" as noncovered employment. Minn.Stat. § 268.035, subd. 20(20) (2012).[1] " 'Immediate family member' means an individual's spouse, parent, stepparent, grandparent, son or daughter, stepson or stepdaughter, or grandson or granddaughter." Minn.Stat. § 268.035, subd. 19a (2012).

Weir does not dispute that he falls within this category of employees, but he nevertheless appealed his ineligibility determination to an unemployment-law judge (ULJ) on two grounds. He claimed that (1) because his employment with ACCRA was initially covered employment, he should have been notified of the statutory amendment and (2) the statute classifying his employment as noncovered employment violates the Equal Protection Clause of the Minnesota Constitution.

After a telephone hearing, the ULJ determined that Weir is ineligible for benefits because his employment is considered noncovered employment and that he, the ULJ, did not have the authority to determine the constitutionality of the statute. Weir requested reconsideration, which the ULJ denied. This certiorari appeal follows.

## ISSUE

Does Minn.Stat. § 268.035, subd. 20(20), violate the Equal Protection Clause of the Minnesota Constitution?

1. The original amendment was numbered 268.035, subdivision 20(19), and stated that "employment for a personal care assistance provider agency by an immediate family member of a recipient who provides the direct care to the recipient through the personal

## ANALYSIS

We "may reverse or modify the decision [of the ULJ] if the substantial rights of the petitioner may have been prejudiced because the findings, inferences, conclusion, or decision are ... in violation of constitutional provisions." Minn.Stat. § 268.105, subd. 7(d) (2012). The constitutionality of a statute is a question of law, which we review de novo. *Gluba ex rel. Gluba v. Bitzan & Ohren Masonry*, 735 N.W.2d 713, 719 (Minn. 2007). We presume the constitutionality of Minnesota statutes and will exercise our power "to declare a statute unconstitutional with extreme caution and only when absolutely necessary." *Id.*

The Minnesota Constitution guarantees that "[n]o member of this state shall be disenfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." Minn. Const. art. 1, § 2. This clause has been described by our supreme court as a "mandate that all similarly situated individuals shall be treated alike." *Greene v. Comm'r of Minn. Dep't of Human Servs.*, 755 N.W.2d 713, 725 (Minn.2008) (quotation omitted).

To determine whether a statute violates equal protection, a threshold consideration is whether similarly situated individuals are treated differently. *Schatz v. Interfaith Care Ctr.*, 811 N.W.2d 643, 656 (Minn.2012). If a challenged statute does not treat similarly situated individuals differently, there can be no equal-protection violation. *Id.* at 657.

care assistance program under section 256B.0659" would be considered noncovered employment. 2010 Minn. Laws ch. 347, art. 2, § 2, at 1079. The non-substantive clarifying amendment took effect on July 1, 2012. 2012 Minn. Laws ch. 201, art. 3, § 2, at 348.

In a recent case challenging the constitutionality of a pay cut imposed on "relative" PCAs but not on "nonrelative" PCAs, this court determined that relative and nonrelative PCAs are similarly situated. *Healthstar Home Health, Inc. v. Jesson,* 827 N.W.2d 444, 449 (Minn.App.2012). "Relative" is defined as "the parent or adoptive parent of an adult child, a sibling aged 16 years or older, an adult child, a grandparent, or a grandchild." Minn.Stat. § 256B.0659, subd. 11(10)(c).

While "relative" is defined differently from "immediate family member," this court in *Healthstar* based its analysis of whether the two groups are similarly situated on the fact that both groups of PCAs "are required to comply with the same statutes, rules and regulations." *Healthstar,* 827 N.W.2d 444, 449. As with relative PCAs, immediate-family-member PCAs have the same duties and are required to comply with all of the same statutes, rules, and regulations as all other PCAs. We therefore conclude that the statute denying unemployment benefits to PCAs caring for immediate family members treats similarly situated people differently.

■ Once it is determined that classes of people are similarly situated but treated differently, this court applies the Minnesota rational-basis test to determine if the challenged statute can withstand an equal-protection challenge. *State v. Russell,* 477 N.W.2d 886, 888 (Minn.1991); *Healthstar,* 827 N.W.2d 444, 449–50 (discussing the difference between the Minnesota rational-basis test and the federal rational-basis test and concluding that the Minnesota rational-basis test applies); *see also Kolton v. Cnty. of Anoka,* 645 N.W.2d 403, 411 (Minn.2002) (holding that strict scrutiny is only applied when a legislatively created classification involves a suspect classification or a fundamental right).

■ To survive constitutional scrutiny under the Minnesota rational-basis test: (1) The distinctions which separate those included within the classification from those excluded must not be manifestly arbitrary or fanciful but must be genuine and substantial, thereby providing a natural and reasonable basis to justify legislation adapted to peculiar conditions and needs; (2) the classification must be genuine or relevant to the purpose of the law; that is there must be an evident connection between the distinctive needs peculiar to the class and the prescribed remedy; and (3) the purpose of the statute must be one that the state can legitimately attempt to achieve.

*Russell,* 477 N.W.2d at 888 (quotation omitted). "The key distinction between the federal and Minnesota tests is that under the Minnesota test 'we have been unwilling to hypothesize a rational basis to justify a classification, as the more deferential federal standard requires.'" *State v. Garcia,* 683 N.W.2d 294, 299 (Minn. 2004) (quoting *Russell,* 477 N.W.2d at 889). Rather, the Minnesota test requires "a reasonable connection between the actual, and not just the theoretical, effect of the challenged classification and the statutory goals." *Russell,* 477 N.W.2d at 889.

### Distinction between classifications

The first step in this analysis is to determine if there is "a genuine and substantial distinction between those inside and outside the class." *Id.* Such distinctions cannot be based on anecdotal evidence or support. *Id.* at 889–90; *Mitchell v. Steffen,* 487 N.W.2d 896, 904 (Minn.App.1992), *aff'd,* 504 N.W.2d 198 (Minn.1993) (analyzing the equal-protection claim under the U.S. Constitution only).

In *Russell,* the legislature created a distinction between a person possessing three

or more grams of crack cocaine and a person possessing three or more grams of powder cocaine by providing for stricter punishment for a person caught possessing crack cocaine. 477 N.W.2d at 887. One rationale for this classification was that the possession of at least three grams of crack cocaine was indicative of someone being a street dealer. *Id.* at 889. The supreme court concluded that the classification failed the first step of the Minnesota rational-basis test because the classification was not based on studies or evidence, but from "anecdotal observations of one expert witness" who had questioned people regarding the issue. *Id.* at 889–90.

In *Mitchell,* the legislature created a distinction between public-assistance recipients who had been residents of Minnesota for less than six months and those who had been Minnesota residents for more than six months by providing that those who had been residents of Minnesota less than six months would receive 60% of the normal rate. 487 N.W.2d at 899. The rationale for this distinction was to deter people from moving to Minnesota for the sole purpose of collecting higher welfare benefits. *Id.* at 900. This court concluded that the distinction failed the first step of the Minnesota rational-basis test because it was not based on studies or evidence, but from "anecdotal evidence" of people who claimed to have moved to Minnesota just for the benefits and from the "general perception" that benefits were higher in Minnesota. *Id.* at 900, 904.

The supreme court concluded in *Russell* that, without more factual evidence to support the classifications, the classifications were based on "an arbitrary rather than a genuine and substantial distinction." *Russell,* 477 N.W.2d at 890; *see also Mitchell,* 487 N.W.2d at 904 (quoting *Russell,* 477 N.W.2d at 890). Similarly, in *Healthstar,* we stated that "the rationale for the dis-

tinction ... is based purely on assumptions rather than facts." 827 N.W.2d 444, 451. Despite citation on appeal to studies about the number of people receiving care from unpaid family and friends, we rejected "the hypothesis that relative PCAs would be morally compelled to provide PCA services for lower pay than nonrelative PCAs." *Id.*

Here, the legislature adopted the amendment in question because it was advised by legal counsel for DEED that a fraud problem exists that is more likely to occur with immediate-family-member PCAs. According to DEED,

applicants would front-load all of the approved hours during any given six-month period, claiming that they worked extraordinarily high hours during the early weeks or months, and then collect unemployment benefits during the remainder of the time period.... These PCAs then collected both wages and unemployment benefits every year, which required the complicity of their family member clients....

While such manipulation would also theoretically be possible in non-family settings, it is substantially less likely. Non-family clients would have no motivation to seek unemployment benefits for unrelated PCAs, nor would they be likely to report that all of their care hours had been used up early in the six-month period, risking that the non-relative PCA would not follow through on the bargain, and continue showing up to provide care even after the hours were reported and the wages were paid.

But DEED offered no evidence or legal authority to the legislature to support this allegation of fraud, nor has it offered any factual support on appeal. The legislation, therefore, without any factual support for the hypothesized manipulation of the system by immediate-family-member PCAs,

was "based purely on assumptions rather than facts." *Id.* An offered explanation for why similarly situated people should be treated differently, without evidence to support it, is "purely anecdotal." *See Russell,* 477 N.W.2d at 889.

Under the Minnesota rational-basis test, we conclude that the distinction between immediate-family-member PCAs and non-immediate-family-member PCAs is arbitrary and does not provide a genuine and substantial basis for denying unemployment benefits to immediate-family-member PCAs who are legitimately unemployed.

**Evident connection between the needs of the class and the remedy**

Even if there were facts to support the allegation that this type of fraud is both widespread and particular to immediate-family-member PCAs, we disagree that there is "an evident connection between the distinctive needs peculiar to the class and the prescribed remedy" under the next step of our analysis. *See Russell,* 477 N.W.2d at 888. The articulated basis peculiar to the class is to eliminate fraudulently obtained unemployment benefits. But the statutory schemes for both the PCA program and the unemployment-insurance program have fraud protections. For example, "flexible use" of the allocated PCA hours requires that there be a "written month-to-month plan of the projected use of personal care assistance services," and the plan must ensure "that the total authorized amount of personal care assistance services for each date span must not be used before the end of each date span in the authorization period." Minn.Stat. § 256B.0659, subd. 15(d)(2). If PCA services cannot be used up on any given authorization period, there seems to be no opportunity for immediate-family-member PCAs to use up the hours at the beginning of the period and then collect unemployment.

In addition, the unemployment statutes require that applicants are available for suitable employment and actively seeking suitable employment to be eligible for unemployment benefits. Minn.Stat. § 268.085, subd. 1 (2012). An immediate-family-member PCA participating in the scheme described to the legislature would be committing fraud if he certified that he was available for suitable employment. This is because, according to DEED, the immediate-family-member PCAs would "continue showing up to provide care even after the hours were reported and the wages paid." If a PCA is still caring for the recipient, he is not available for suitable employment, and any statement to the contrary would be knowingly false. Minnesota law provides that "[a]ny applicant who receives unemployment benefits by knowingly misrepresenting, misstating, or failing to disclose any material fact, or who makes a false statement or representation without a good faith belief as to the correctness of the statement or representation, has committed fraud." Minn.Stat. § 268.18, subd. 2(a) (2012). The statute imposes a mandatory penalty in the amount of 40% of the benefits fraudulently obtained. *Id.*

There is no evidence that the existing statutory protections against fraud are inadequate. Nor does it seem likely that denying immediate-family-member PCAs all unemployment benefits would entirely eliminate any potential for fraud. DEED admits that "[t]here are certainly applicants like Weir who never attempted to manipulate the system. Similarly, it is unlikely that PCAs working for non-family members never manipulate the system." Under these circumstances, immediate-family-member PCAs are being arbitrarily denied unemployment benefits. *Russell,* 477 N.W.2d at 891 ("Without more evidence, it is as easily assumed that individu-

als jailed for possession of three grams of crack are mere personal users who were arbitrarily penalized as dealers."). We therefore conclude that the connection between the needs of the class and the prescribed remedy is simply too tenuous to pass constitutional muster.

### Legitimate purpose

The third step of Minnesota's rational-basis test is to analyze whether the purpose of the amendment is "one that the state can legitimately attempt to achieve." *Id.* at 888 (quotation omitted). "[T]he protection of a governmental entity's financial stability is a legitimate public purpose." *Lienhard v. State,* 431 N.W.2d 861, 867 (Minn.1988). But the state may not achieve this purpose through illegitimate means. *Mitchell,* 487 N.W.2d at 905.

In *Mitchell,* this court held that the statute was overbroad and thus constitutionally suspect under this third step. *Id.* We noted that the statute "create[d] an irrebuttable presumption that all new residents come to Minnesota to collect higher benefits." *Id.* The classification here is similarly overbroad because it creates an irrebuttable presumption that any immediate-family-member PCA who applies for unemployment benefits is doing so fraudulently.

Because none of the three steps of Minnesota's rational-basis test is satisfied, we hold that Minn.Stat. § 268.035, subd. 20(20), violates Minnesota's Equal Protection Clause. Because we are reversing on this basis, we do not reach Weir's argument that he should have been notified of the statutory amendment.

### DECISION

Because the distinction between immediate-family-member PCAs and non-immediate-family-member PCAs is based on anecdotal evidence of a hypothetical fraud scheme, there is no genuine and substantial distinction between these classifications. And even if the distinction between these classes were genuine, there is no evident connection between the claimed fraud and the prescribed remedy of denying unemployment benefits to all immediate-family-member PCAs. We therefore hold that classifying employment provided by immediate-family-member PCAs as noncovered employment violates the Equal Protection Clause of the Minnesota Constitution.

**Reversed.**